## CONSOLIDATED INTERNATIONAL EQUIPMENT & SUPPLY CO.

### v.

### UNITED STATES.

C.D. 3901; Protest Nos. 61/139–11755–60, 61/724–17968–58.

United States Customs Court, Second Division.

Oct. 16, 1969.

Siegel, Mandell & Davidson, New York City (Allan H. Kamnitz, New York City, of counsel), for plaintiff.

William D. Ruckelshaus, Asst. Atty. Gen. (Bernard J. Babb, New York City, trial attorney), for defendant.

Before RAO and FORD, Judges.

FORD, Judge.

The cases listed above, consolidated for the purpose of trial, were the subject of a decision in Consolidated International Equipment & Supply Co. v. United States, 58 Cust.Ct. 329, C.D. 2978 (1967). The merchandise involved consists of certain Multineg machines which were classified under the provisions of paragraph 353, Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, 86 Treas.Dec. 121, T.D. 52739, as articles having as an essential feature an electrical element or device and assessed with duty at the rate of 13¾ per centum ad valorem.

Plaintiff in the case at bar, by amendment, claims the machines are entitled to entry free of duty under the provisions of paragraph 1643, Tariff Act of 1930, as typesetting machines. The original claim as printing machinery under paragraph 372, Tariff Act of 1930, as modified, not having been pressed, is deemed abandoned and is hereby dismissed.

The pertinent portions of the statutes involved read as follows:

Paragraph 353 of the Tariff Act of 1930, as modified by T.D. 52739:

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing ma-

chines, refrigerators, and signs, finished or unfinished, wholly or in chief value of metal, and not specially provided for:

\* \* \* \* \* \*

Other (except \* \* \*) .........13¾ ad val.
Paragraph 1643 of the Tariff Act of 1930:
    Linotype and all typesetting machines,
    \* \* \* ; all the foregoing whether in
    whole or in part, \* \* \* .........Free

The record herein consists of the testimony taken and the exhibits received in the previous case, C.D. 2978, *supra*, which was incorporated herein. No further evidence was adduced. The function of the involved machines was described in the decision in the incorporated case as follows.

The mechanism, or device, at bar is one in which a negative (produced by a photographic camera) is placed in contact with a sensitized plate, to make a positive image of the negative. What differentiates this particular mechanism is that through a system of precise measurements and controls it will automatically produce on the plate, not just one image, but repeated images covering the entire plate, through what is called a step-and-repeat process. As the plate emerges from the device when this operation is completed, the plate is ready to be inserted in a photo-offset machine which will do a print job from this plate. The sheet which comes from the photo-offset machine will, therefore, be roughly comparable to a sheet of stamps, in that it shows many identical prints. It is the automatic step-and-repeat function used in preparing the plate for use in the photo-offset machine that distinguishes the device at bar, which is called a Multineg.

It is the position of plaintiff that the decision in Lanston Industries, Inc. v. United States, 49 CCPA 123, C.A.D. 807 (1962), is controlling herein. The *Lanston* case, *supra*, involved the proper classification of certain monophoto machines which were classified as photographic cameras and parts under paragraph 1551, Tariff Act of 1930, and claimed to be typesetting machines under paragraph 1643, Tariff Act of 1930. The court therein made the following observation of the function of the monophoto machine.

\* \* \* We are constrained to agree with appellant's statement in its brief: "The fact of the matter is that this apparatus has only one function—*it sets type* on sensitized paper [or it may be on film]." [Our emphasis.] Appellant quotes its witness as saying of the Monophoto machine:

Q. \* \* \* What is the objective of that machine; what is its function and purpose?

A. Its function is to produce *composed type* to be used for printing by either offset or gravure process. [Our emphasis.]

It will be observed that the *single* function of the machine has been stated to be both setting and composing type and therein lies the answer to the issue in this case, for, as is amply borne out by the dictionaries, setting and composing are one and the same thing. To go back to the 1913 Funk & Wagnalls cited above, under "composition" it states, *"Print.* The act or process of setting type for printing." Webster's New International Dictionary (1937) under "compose" says, "5. *Print,* To arrange (type) in a composing stick in order for printing; to set (type)." Under "composition" it again says, "16. *Print.* The setting up, arranging, and imposing of type." We may even refer in support of this conclusion to the definition quoted in the Government's brief of a "typesetting machine" (Webster's New International Dictionary of the English Language, 2nd Edition):

Any of various keyboard machines for automatically *composing* printers' types. \* \* \* Those chiefly used at present are the type-casting machines: the Linotype, invented by Ottmar Mergenthaler (1878), and the *Monotype,* invented by Tolbert *Lanston* (1885). [Our emphasis.]

* * * In the Monotype the matrix is metal and the characters are in the form of itaglio mold cavities into which molten type metal is injected, one at a time; in the Monophoto machine the matrix carries the characters (which are in the same type of matrix holder for use with the same type of positioning mechanism) as transparent areas through which a light beam passes, to expose them through an optical system on a photosensitive surface. In the former case, type is composed or set in metal; in the latter case, type is set or composed photographically on a strip of sensitized paper or film. Both machines are used in the same trade by the same people for substantially the same purposes, the ultimate production of printing plates which are used to print with ink on paper. Furthermore, the typesetter or compositor, who as a person initiating the entire operation actually sets or composes the type, uses the same keyboard to punch the same paper tape whether the final act in the setting or composing process is done by the Monotype machine in metal or the Monophoto machine on film.

The witness, who was expert in this field, constantly referred to the hot metal, or Monotype process, as the old-fashioned process. Thus we have before us an example of technical progress requiring that we consider whether something necessarily unknown to Congress when the words "all typesetting machines" were written into the statute was intended to be included by that clause. On the facts of this case, we are unable to see in the Monophoto machine anything more than a technical advance in typesetting machines which Congress must have foreseen. The Monotype machine, having been well-known in the printing industry long before 1930, was presumably clearly within the ambit of paragraph 1643. Its modern version, the Monophoto, we believe, falls in the same category. The language used, "*all* typesetting machines," [our emphasis] does not suggest that we should try to search out nice differences between one kind and another or exclude improvements. We are also mindful of the truism that tariff acts are written for the future. Pickhardt v. Merritt, 132 U.S. 252, 257 [10 S.Ct. 80, 33 L.Ed. 353]; Newman v. Arthur, 109 U.S. 132, 138 [3 S.Ct. 88, 27 L.Ed. 883]. [Emphasized and bracketed matter quoted.]

The record establishes the function of the Multineg machine is that of setting type by means of photocomposing on sensitized material. The involved machines are used by the same trade, the same people, and for substantially the same purpose, viz, the production of printing plates.

The record also establishes that the involved machines are a technological advancement of the basic form of lithographic printing. In lithographic printing, images were transferred to polished lithographic stones. In 1934, a manual photocomposing machine was invented which operated on the same principle as the Multineg machine. Since it was manual, it was not as accurate and an experienced operator could make 30 to 40 steps in one hour whereas the involved machines, developed in 1954, automatically produce 240 images an hour on press plates.

In the case of Davies, Turner & Co. v. United States, 45 CCPA 39, C.A.D. 669 (1957), the court reviewed the two well established principles, i. e., that tariff acts are written for the future as well as the present and the meaning of an *eo nomine* provision is to be determined as of the date of the enactment of the tariff act. The court therein quoted the following from Smillie & Co. v. United States, 12 Ct.Cust.Appls. 365, T.D. 40520 (1924):

The rule [that the meaning of an *eo nomine* provision of a tariff act is that which it has at the time of enactment] of course, does not operate to exclude articles which are not known at the time of the passage of the act, but which come into being later. *As*

*to all such articles the statute will be held to apply if the article possesses an essential resemblance to the ones named in the statute in those particulars which the statute established as the criteria of the classification.* (Italics ours.) [Emphasized and bracketed matter quoted.]

It appears to us that the involved Multineg machines possess an essential resemblance to a process in existence on the date of enactment of the Tariff Act of 1930, viz, lithographic process. We are of the opinion that the involved Multineg machines are for tariff purposes typesetting machines which are entitled to entry free of duty under the provisions of paragraph 1643, *supra*, as claimed.

Judgment will be entered accordingly.